All right, we're back to more water damage. This case is 23-8068 Bankers Standard v. JTEC. Mr. Wright, go ahead. Good morning, Your Honors. May it please the Court, my name is Richard Brewer and I represent the Appellant Bankers Standard in this matter. This matter comes before the Court as Bankers Standard seeks to reverse the decision of the U.S. District Court of Wyoming, which granted summary judgment to JTEC based on when the statute of limitations began to run per Wyoming's professional liability statute, that's 13107. The underlying facts and the incident is that water damage was occurred at the residence of Bankers Standards Insurance on May 7, 2020, when a water filter on the domestic water line in the house of David Warren Grossman, Bankers Standards Insurance, failed. JTEC was the mechanical engineer responsible for the design of the mechanical system of that house and Bankers Standard brought a lawsuit based in several ways to recover money they paid to him on behalf of the Grossmans for that damage. In 2017, Defendant JTEC was hired by an architect, Studio Plaid, to prepare mechanical plans and specifications for submission to the local jurisdiction for purposes of obtaining a building permit and for construction of the Grossman house as well as a number of other homes in the same suburbs. The homes were then built by a defendant, Pinnacle Construction, which is not part of this appeal, based on those plans and those plans included what is called a water entry detail. The water entry detail in the JTEC plan improperly located the failed water filter upstream of the required pressure reducing valve, or PRV, when it was supposed to be downstream or after the PRV. As a result, the design exposed that water filter to extremely high water pressure, which eventually caused the filter housing to Could the architect have changed the plan after submission of the water entry detail? After that point, could he have said, I thought further about it, I'd like to make some further revisions? I don't know what the contract between Studio Plaid and JTEC says. I would imagine that if the architect had concerns about it, they certainly could have raised those to JTEC and JTEC could have chose to But you think it would have been JTEC's responsibility and not the architect's responsibility? Absolutely. JTEC is the mechanical engineer for the project. They're the ones that prepared the plans Okay, so when could JTEC have changed the plans? When could they have? Yeah, I mean, was there any limit to when they could have said things were changed? Well, I assume they could have changed that plan at any point in time during the course of their work during the rendering of their services. They made revisions to their plans in other areas, but they did not ever change I understand that. Is there anything in the record about which plans, I presume it would be the final plans, were used by the plumbing contractor in actually installing the mechanical? Well, um... Was it the final plans? I don't know that there's specific testimony that I've used this one that says final on them, but presumably they would have used the final plan Does that matter since, I mean, and wouldn't it matter since the statute requires that the cause of action arose from an act to error or omission in the rendering of services, and doesn't it arise with whatever plans they actually use? And presumably that was the final plan? Well, the statute doesn't address when the plan is used. The statute only talks to the act, error, or omission. How does the cause of action, though, doesn't it only arise because somebody used these plans? At some point. It's not just the plans themselves that cause, that result in the cause of action. It's the use of these defective plans or negligently designed plans that eventually causes the problem. And so I guess my thought is, perhaps for different reasons, why in the district court, why isn't it the final plans that presumably were used by this plumber to design, you know, to install the valve negligently, basically. Yeah, I don't... Or he installed it the way the plans were, but... I don't doubt that the final plans were what ended up being handed off to whoever. So that's how the mistake then gets made in this house, how they end up with defective plumbing. From that final plan that's used by the plumber that results in the water damage. I don't disagree. Okay. So why doesn't the cause of action arise from that final plan, which contains this defective design? Because the error is in that water entry detail. That was a plan that was done earlier. I know, I'm just asking, what happened with that prior plan? Did the prior plans actually get used? And don't they have to be used in order for a cause of action to arise? I'm sorry, I didn't hear that right. Yeah. The plan is used. The engineer sees the plan. He gives it to people. He gave it to... That plan is given to the authority of the jurisdiction for purposes of issuing a building permit. Right. But the building permit and the issuance of the building permit also isn't the cause of action or where it arose. It's from the actual installation using that plan, right? Well, it starts with the plan. It starts with the plan. Right. But the plan has to be used. That's my point. Yeah, I don't disagree with that. But the plan and the error that is part of that plan was done... You see in the brief where we argue it happened in August 2017. But the only plan that we have, the earliest plan that we have with that detail, is March 1, 2018. That's when the error occurred. What happens after that, yeah, that never changed. So that's when the error occurs. JTAC resists that and says, well, that means that there's going to be a different statute, negligent statute of limitation for every input that goes into the final plan. So one architectural piece and one subcontractor, there's like five or six different professional submissions you're all triggering different statutes of limitation. And Judge Friedenthal resolves that by using the final plan as the appropriate date. Can you respond to that? Yeah, certainly there would be a different trigger date for what I'm arguing then, final plans. I'm not so sure that final plans would apply to every professional that might have been involved in the project. But the language of the statute does not say when the rendering of professional services concludes. It says the act, error, or omission in the rendering of professional services. And that's always, in your view, that's always when they hand over the plan to the contractor. Well, that happens when they hand over engineers' stand plans to the building department. It happens there, too. Now, does that mean that that gives a different trigger date than maybe, just for example, the architect who is considered for a trigger date for that to be when the plans are delivered? Yes, it does. But that's the way the statute is written. I mean, the time period for filing can vary wildly depending on when somebody actually incurs damage. There could be a water filter that fails, you know, two years later. You're still going to be dealing with different time periods then. So, I think that's just a product of the statute and how that statute is written. You know, there was an interesting comment made in the Witherspoon case where they said, hey, look, we understand that our voting here may be fair to some contractors and unfair to others, and such is the nature of a statute of repose. Statute of repose in that case. And that's just the nature of how this statute is written. The professionals, they get a benefit from this statute by having a much shorter time period than they would for a regular negligence or breach of contract claim. Does the final submission of plans do any work here? Does it have any relevance to the legal interpretation you're advancing? Not for this case. Not for this case. Now, might it for somebody else? I mean, Reinke and Witherspoon and Procop talk about a contractual, if there's a contractual relationship between the parties, then the contract, you can't parse out the time periods between contract and tort. So, to answer your question, does it mean, does it have any significance? Yes, it might, but it doesn't for this case. In the Reinke and Witherspoon case that the district court relied on so heavily, that, you know, those courts say these need to be determined on the facts of each case. So what's the unique fact on this case that makes this different? Sorry. Different from those cases? Yeah. In those cases, well, and specifically with Adalisi and the other one on the case, I'm sorry, Adalisi and Leckie, those were omissions. That was something where they were supposed to do something, and they didn't do it. And so, naturally, that omission can't occur until the contractual relationship and contractual services have concluded, because they have up until that time to render. So that's the difference in those cases. I didn't see any cases in Wyoming, Nebraska, or anywhere else that had this specific fact situation. Would this be something we should certify to the Wyoming Supreme Court? And have you requested that? I trust this court's ability to address it. Certainly, Judge Friedenthal could have done that. He recognized that Wyoming law is certainly not settled on this point. She did. Or she, I'm sorry. It was Judge Friedenthal. Sorry. Yes, you're right. She did say that, and she chose not to certify. She kind of went on then and used other states' case law to try to decide what Wyoming would do in this particular instance. Would it be better just to ask Wyoming? I don't know if it would be better. I guess I didn't see those. You'll tell us after you see our opinion. Your balance is very good. I'll come back to you and ask if I can certify. To me, what you were just saying was that basically those cases, at least some of them, you were talking about the Wyoming cases, but the out-of-state cases were all, I think there was contractual privity in those cases. Or they weren't like this case. And I'm just wondering about using those cases to predict Wyoming law when we could just ask Wyoming. Well, I certainly have concerns about how the court interpreted those two Nebraska cases. And Wyoming has looked to Nebraska in situations before in other issues that I've come across. And I did want to reserve just a couple of minutes. I'll give you a minute. Thank you. I appreciate it. But you know you can certify this, but I don't think it is such a complex issue that this court certainly isn't capable of handling that. Thank you. I see my time is up. Thank you. Thank you. Thank you. Good morning. May it please the court. I'm Serena Hinden, and I'm here on behalf of JTAC, the appellee. The district court's ruling granting summary judgment to JTAC should be upheld. Going back to some of the questions that this court had in regards to banker's standard, first off, it is the final plans. And it is mainly because that was the last chance that JTAC had to make a change. It was the last chance that JTAC had to review the plans, discover any errors, omissions, or any errors or omissions or any acts that it had. That's where I'm just a little unclear. I mean, if the architect had submitted these plans, and then six months later or a month later, somebody in their office said, gosh, I've been filing these and looking at them, I think there's a mistake. They certainly could have called up and said, wait a minute, I want to change things. Right? I think that's correct. I mean, the architect is different than the mechanical engineer. Well, I meant the mechanical engineer. Couldn't the mechanical engineer have called the architect and said, hey, I discovered I made a mistake. And I think we ought to look at this again. Yes. I mean, they did have, I mean, if that's what the engineer had a chance to do, then of course. I mean, during its contract, these plans went through at least six revisions. But not JTACs, right? JTACs. Yeah, JTAC plans went through six revisions. Right. But the error and omission was in the first submission and stayed throughout the six variations, correct? Although the deposition testimony actually talks about the third revision. OK. The March 1, 2018 revision. Correct. Which is the one that plaintiffs suggested. So why wouldn't that be the critical error or omission here? Because the final submission is just kind of arbitrary to some extent. Twofold. Because JTAC's contract with Studio Plaid anticipates a continuous iterative process of change for these plans. This isn't a contract case. These parties aren't in privity. This is a tort case. Why would that make any difference at all? Because I like the way the Wyoming Supreme Court in Metzger v. Kalki comes back to a continuous service, especially if there's an error in one of the treatments. I mean, Metzger was a medical case that looks at the various treatments. I mean, typically there's no contract between a patient and a doctor. And as far as looking at— Treatments are more—that's an ongoing situation. These plans were submitted and then never changed after March 1, 2018. I don't think that's comparable to medical treatment, ongoing medical treatment. There is a concept of a single act exception in regards to continuous treatment or continuous care. It's something that the Wyoming Supreme Court reviewed and threw out. They said that Wyoming should not adopt it. But what Metzger said as far as the—in the continuous treatment as far as an error is that it is not the initial error or the initial mistake that causes the injury. It is the continued adherence to that error that causes the injury, which is what is happening here. It is that negligent adherence to that error all the way through the plans that in the end causes the injury. So the way you sort it out is that JTAC committed negligence the day before the final submission because it negligently failed to correct the plans. Although I would say causation has not been determined in this case, I would agree that essentially it was up to that last— Because it could have corrected that plans until the last second. Until the last second. And that is similar to a lot of these construction cases. In regards to why— This isn't a contract case. It could have corrected them after that time. If somebody in their office said, oh, gosh, we just discovered we made a big mistake. Actually, until the water diversion point was built, they could have stepped up and said, hey, we did something wrong. It's got to be fixed, right? I would agree with that. That would impose a continuing duty on them after their pay was no longer— they were no longer getting additional pay. They weren't a supervising agent getting a supervisory payment to kind of stay on top of things. And so that kind of would have been gratuitous at that point. That's why you say that's the point we use. I would agree with that as well. Because what you're describing is the continuous care concept. And continuous care or continuous service in the state of Wyoming has been looked at as far as beyond the medical community. And extended to lawyers and to insurance agents. Although the facts of those cases, the Wyoming Supreme Court has not adopted it. Mainly because the continuing service was not the same or similar or related to the work that was done prior. And I believe the continuous care doctrine is used in place of or if there is no contract. Which is what you were describing. Architects sometimes take on a contractual duty of continuous supervision throughout the construction process. But you pay for that service. And here that service wasn't paid for. Particularly by the person one level below that that was designing the system. Just one little part of that system. Yeah, you're talking about construction administration. And yes, that was a separate service on the JTEC and studio plans contract. And it was not asked for. JTEC was not provided in the shops. They were not asked to come on site to take a look. So that's why that moment takes on a greater significance here. Because after that they would be an interloper in a way. Correct. In a sense that if they had continued with the construction administration, I would argue that that is a continuation of the same or similar services that they were providing as far as design goes. The district court relied on the Lucky Gate and what was the other case? I've also forgotten the name. Witherspoon. Witherspoon. Oh no, Adalisi. The Wyoming cases. Well, it talked about contractual breaches. That was a bit off base, wasn't it? I mean, we're not talking about a contractual breach here. Well, on both of them they were talking about omissions. And it could be argued that JTEC omitted to catch this particular mistake by the time it turned in the final plans. But it was relying on the idea that they had a contract, the existence of a contract between the parties to the litigation. And that up to a particular point that contract continued and their services continued. And the court used that then and said, well, until the final plans were submitted they were still basically under contract. This isn't a contract case. So I'm confused by how that really works. Because the way this particular statute is applied in Wyoming, it really doesn't matter whether it's a contract or a tort case. You're going to be using the same, you've got the same two years. And this was addressed in Pro Cop v. Hochhalter, which also actually mentions where the Wyoming Supreme Court includes and cites to the Runke case and the Witherspoon case. Now, in Pro Cop was where they were talking about you cannot parse a single professional relationship into a tort and contract. Because in order to extend your statute of limitations, as far as the professional liability statute of limitations is concerned, it's two years. As far as the contract statute of limitations in Wyoming, it's 10. And that is why the plaintiff in Pro Cop was wanting to use the contractual statute of limitations instead of the professional liability statute of limitations. The other case that has actually come before this court is Fritig v. Sagewick, where you had a plaintiff that was trying to sue a licensed professional that it was not in privity with. And where the licensed professional was actually working on behalf of an insurance company for an electrician that had allegedly had done some negligent work in a barn, which resulted in a fire in the barn and burning it down. In that case, even though there was no privity or contract between the plaintiff and this particular licensed professional doing this work, the court still upheld the 1-3-107 as far as the two years was concerned. It is the act. It is the cause of act. Measured by what? In that case, what was the measuring event that started the statute running? The start of the statute was... In the barn case you just described. The report. As far as the report that came out of the licensed professional. However, to extend that, the plaintiff did not file until three years after he had admitted that he knew of the issue. Because it was three years after the discovery, the statute, of course, completely bars it. So they didn't have to go back to the actual report date and argue about when the report was made. Didn't the negligence occur here, though, when the design flawed plan was handed over to the architect? On May 31st, 2018. No, earlier. May 31st, 2018 is the admitted last date of any changes that JTIC provided to the contract. I'm suggesting the negligence occurred when they gave the plan to the contractor. But the thing is, the May 31st, 2018 is the sixth revision of the water entry detail. So, in other words, if we're going to be going back to when the original water entry detail was designed, what that does is it binds the engineer to that particular design decision. And it pretty well takes out the ability to- It could always be a change, but if it remains in the plan, and it's the ultimate cause of the injury, didn't the negligence occur when that defect was delivered to the contractor? I would go back to the Messker case, where the Wyoming Supreme Court, again, states that it's not necessarily the mistake, but rather the adherence to that mistake that causes the injury. Well, it is the original mistake that caused the injury. It may have been exacerbated by the failure to correct it. But certainly submitting the wrongful plan, looked at just by itself, caused an injury. Now, maybe there was a chance to remedy that injury cause that wasn't taken. So there might have been a cause of action for an affirmative mistake, and then another action for a failure to correct. Those are two different kinds of claims, and they might be measured by different statutes of limitation. Well, I would also say that if we continue down this path, what's going to happen is that you will be requiring plaintiffs and defendants to take a look at a set of plans and determine when a design decision was made, when each design choice was made. No, not when internally it was made. It was when the product was delivered to the client intending to be the final product. Well, but it seems like there's some confusion here then. Is that because it sounds like the design plan was made on Revision B. Design choice, or the negligence that is being alleged here, was made on Revision 3. However, and that date of Revision 3, I believe, is March 6th of 2018. March 1st of 2018, yep. Yeah, okay, March 1st of 2018. Well, Revision 6, it goes through two more revisions before it hits May 31st, 2018 of Revision 6, of this water entry detail. And again, it starts to pervade into the rest of the plan set and doesn't take into account the continuity of the plan set. And I just want to give you a brief... about the Wyoming Supreme Court, and maybe this would be a case for them to talk to. Something to be certified? Did you consider that, ask them? I did consider it, but no, I did not certify it to them. Well, I mean, you would ask for it. You didn't ask in the district court, I assume. No. Do you think that would be appropriate here? I think it would be a good idea. I think it would be, just because of the ramifications of this particular case, I think it would be a good idea to submit it to the Wyoming Supreme Court. But you're aware of our general reticence to certify if there hasn't been a consistent request for certification from the beginning. I mean, that's not 100% ironclad probably, because it's discretionary, but it certainly has been almost uniformly the rule we've applied. No, I do understand that. But again, I just want to come back to one more point on this. If we take a look at the overall plan set of mechanical plans for the Grossman, we have the detail sheet which has the water entry detail with the date of March 1, 2018. That, along with the other details on that sheet, are incorporated into the plan sheet on page, I think it's 75 of the record. And that plan sheet has a date of May 17, 2018. So, if you've got these details with the date of March 1, 2018 being incorporated into a plan of May 17, 2018, which is clearly barred using the appellant's argument, at that point, the district court will have to determine how much of the relation between the two plan sets actually pervades each other. Is one now going to push the burden onto the plan to show that due diligence could not have found this, or is it going to be barred by time? Thank you. Your time has expired. We appreciate the argument. And could you give a minute 30 for Mr. Reardon? Thank you, and we ask for your time. Thank you, Your Honor. Just a minute. Okay, there we go. I'm sorry. Just a quick clarification. The earliest copy of the plan that we have that's in the record is the March 1st with the water entry detail. But you can tell by the revisions that are listed on there that that water entry detail had not changed at all since August, the August 2017 date when they were submitted a plan. So, when Ms. Herndon was saying that the water entry detail was revised six times, that's not correct. The plan, because the water entry detail is a part of mechanical plan M0. M0 was revised six times with the final one being the May 31st, 2018. Water entry detail, the placement of the PRV, and the placement of the water filter, that never changed. Never changed from the permit set. Real quick on PROCOP and ranking. Both those courts emphasized that their decision was, and it didn't have anything to do really with the, so much I should say, is when that trigger date is, especially PROCOP, because that was an issue between the two statute supplementation time periods between contract and tort. But what both courts emphasized in those cases was the presence of contractual relationship in steering the court to where they went. So, just wanted to clarify that. Thank you. We would ask that District Court's decision be reversed. Thank you. Thank you, counsel. You're excused on the cases submitted. The court will be in recess until 2. Thank you.